

**SIGNED this 14th day of December, 2011.**

_____
JOHN C. AKARD
UNITED STATES BANKRUPTCY JUDGE
_____

# United States Bankruptcy Court
Western District of Texas
San Antonio Division

| *In re* | BANKR. CASE NO. |
|---|---|
| PATRICK A. HARTNETT AND TIFFANY P. HARTNETT | 10-53290 |
| *Debtors* | CHAPTER 7 |
| KERRY O'BRIEN AND SUSAN O'BRIEN  *Plaintiffs,*  v.  PATRICK A. HARTNETT AND TIFFANY P. HARTNETT  *Defendants.* | ADV. NO. 11-05010 |

**MEMORANDUM OF OPINION
ON OBJECTION TO THE DISCHARGEABILITY OF A DEBT**

In this adversary proceeding Kerry O'Brien and Susan O'Brien seek to have their claim against Patrick A. Hartnett declared not discharged in Mr. Harnett's bankruptcy pursuant to §523(a)(2), (4), and (6) of the Bankruptcy Code.[1] Originally Tiffany P. Harnett was named as a defendant in this adversary proceeding but she was non-suited during the trial.

Background

Effective January 29, 2008, Mr. and Mrs. O'Brien entered into a 13 page Agreement Between Owner and Contractor for Construction of Residence with Sally F. Powell Company, Inc., a Texas corporation [O'Brien Exhibit 1] (the "Contract"). The house was to be built on a lot owned by the O'Briens known as 12 Highgate in Bexar County, Texas. The Contract was signed on behalf of the contractor by its President, Chad Powell. The contractor did business as Chad Powell Homes. The Contract contained Insulation Characteristics in ¶ 2.10 but was subject to both parties approving the plans and specifications [¶ 8.02]. Mr. Powell signed the General Conditions [O'Brien Exhibit 2] on March 18, 2008. Presumably the O'Briens signed that document about the same time. The General Conditions recites that the plans were by Sam Allen Design and contain what one would consider the specifications for the construction.

The Contract Sum specified in ¶ 3.1 of the Contract was $1,105,611.00 "subject to any addition or reduction in amount thereof pursuant to authorized Change Orders." Paragraph 3.2 states:

> The Contract Sum shall include Contractor's profit, plus all direct and indirect costs of the Work including, without limitation, all building permits, insurance, all sales, consumer, use and similar taxes for the work or portions thereof, along with all federal income taxes.

The terms "Commencement Date" and "Completion Date" are both defined on page 2 of the Contract. The work is to commence when a building permit is secured and the Completion Date is "the date of substantial Completion and notice to Owner, but not later than 365 days after the Commencement Date, unless such Commencement Date is extended by the terms of the Contract Documents or due to an Excused Delay."

With respect to change orders, ¶ 8.01 states:

> **Payment for Change Orders.** Change Orders over $2,500.00 in the aggregate, if in favor of Contractor, shall be paid to Contractor, at the option of Contractor, by Owner at execution of such Change Order. All Change Orders, for which a credit is due Owner, shall be credited to Owner at the time the deleted item would have otherwise been incorporated into the Work. All other Change Orders shall be paid or credited as part of the Final Payment (emphasis in original).

During the trial, change orders in favor of the owner were referred to as "reverse change orders."

The O'Briens financed the construction so that it was not necessary for the contractor to obtain construction financing. Mr. O'Brien testified that he sold stock for approximately $500,000 for the construction of the home and borrowed the balance from a bank. Apparently he deposited his funds with the bank which transferred funds to the contractor's account in

---

[1] The Bankruptcy Code is 11 USC §101 *et. seq.* References to sections are to the Bankruptcy Code unless otherwise specified.

accordance with draw requests. Pertinent provisions of the Contract with respect to such payments are:

> **4.1 Progress Payments; Amounts.** Based on Draw Requests submitted to Owner by Contractor within a reasonable time prior to the date payment of the same is due, and subject to the approval of Lender, the Owner shall make Progress Payments to Contractor, on a weekly basis on Friday of each week. The amount of each Draw Request and the Progress Payment made pursuant thereto, shall be an amount, which, when added to the prior Draw Requests, represents the same proportion to the entire amount due Contractor, as provided for herein, that the percentage that the completed portion of the Work, at the time of such Draw Request bears to the entire Work.
>
> ...
>
> **4.4 Application for Payments; Contents.** The Application for Payment shall set out the amount previously drawn, the amount being drawn, and the amount remaining to be drawn. Each Application for Payment shall contain Contractor's sworn statement, which shall constitute a warranty and representation, that the Work can be completed for the amount not yet drawn under the Contract and that the work for which payment is sought has been competed in accordance with the Contract Documents. No draws shall be available for goods in transit, or stored off site without the approval of Owner and proof of adequate insurance.
>
> **4.5 Application of Funds.** The proceeds of any Payment made by Owner under this Agreement shall be solely for Work completed preceding the date of the Draw Request and shall be applied first by Contractor to the payment of any amounts owed by Contractor to subcontractors and suppliers, which are then due, prior to Contractor using any portion of said Payment for Contractor's own benefit.
> (emphasis in original)

Mrs. O'Brien said that she was at the job site most every day. The construction was supervised by Mr. Powell. When Ms. O'Brien needed to discuss monetary matters, she talked to Mr. Hartnett. During the course of construction, Mr. & Mrs. O'Brien decided to delete various items from the contract and have the work performed by other parties. Mr. Harnett agreed that they had the right to do that under the Contract and that various reverse change orders were entered into, resulting in approximately $26,000 due to the O'Briens. Apparently the contractor drew all, or substantially all, of the Contract Sum so that at the time of closing the contractor did not have the funds to pay the O'Briens the $26,000.

The testimony was that the construction started in "the spring of 2008" but the closing was not held until February 11, 2010. The reasons for the delay were not revealed in the evidence.

Mrs. O'Brien complained in an e-mail to the contractor on May 28, 2009 that the contractor had already drawn 95.75% of the Contract Sum and pointed out many items which still needed to be done. Mrs. O'Brien testified that she received about a dozen notices of unpaid invoices from various subcontractors and suppliers. O'Brien's Exhibit 4 lists six of such notices received between June 4, 2009 and November 5, 2009.

Mr. O'Brien said that they did not do the first walk through until October 2009.

An Affidavit of Completion and Indemnity for the benefit of the bank and the title insurance company signed by Mr. Powell states that all bills have been paid [O'Brien's Exhibit 8]. The affidavit is dated December 18, 2009 and recites that the completion date was July 28, 2009. Apparently the affidavit was not presented to the title company until the February 10, 2010 closing. The O'Briens stated that as far as they know, all of the suppliers and sub-contractors have been paid. Mr. Hartnett also testified that all of the suppliers and sub-contractors on this job have been paid.

On February 3, 2010, Mr. O'Brien learned that the contractor did not have the funds to give them a credit or pay them the $26,000 for the reverse change orders at closing. Mr. O'Brien tried various methods to get some security for that obligation, but was unsuccessful. The only thing they got was a letter dated February 11, 2010 addressed to Mr. O'Brien stating "Chad Powell Homes acknowledges its obligation to you in the amount of $26,000.00 for change orders. It is signed by Sally F. Powell Company, Inc. d/b/a Chad Powell Homes by Mr. Hartnett as "VP." A second copy of that letter, which corrected the address of the property involved was also signed Chad Powell without any indication of his title. [Both letters are in O'Brien's Exhibit 9]. Stephen Brook is an attorney who has represented Mr. Powell and his companies for a number of years. Mr. Brook acknowledged that he drafted the February 11, 2010 letter to be put on the company letterhead. He testified that his clients did not want to sign a note because they knew they could not pay it.

Mr. Hartnett, who was a Vice President of the company, ran the office portion of the business while Mr. Powell supervised the construction. Mr. Hartnett or someone under his supervision saw to it that change orders were properly recorded and posted. Mr. Hartnett testified that he did not have authority to sign checks for the company. He and Mr. Powell (his father-in-law) would discuss which bills should be paid; then Mr. Hartnett would prepare the checks for Mr. Powell's signature.

The business closed shortly after the February 11, 2010 closing on the O'Briens' house. Mr. & Mrs. Hartnett filed for relief under Chapter 7 of the Bankruptcy Code on August 31, 2010. Their Statement of Financial Affairs reflects several suits and judgments against them apparently arising out of construction contracts. Mr. Powell also filed for relief under Chapter 7 on August 31, 2010.

## Discussion

11 U.S.C. § 523(a)(2): Mr. Hartnett argues that the February 11, 2010 letter constitutes a novation so that it supersedes the prior obligation arising out of the construction contract. If it is a novation, then the court must look to §523(a)(2).

Section 523(a)(2)(A) provides, that a debt will not be discharged in bankruptcy if it is "for money, property, services, or an extension, renewal, or refinancing of credit," to the extent that it was "obtained by false pretenses, a false representation, or actual fraud." 11 U.S.C. § 523(a)(2)(A). To establish "false pretenses" or "false representations" under section 523(a)(2)(A) "the creditor must show '(1) a knowing and fraudulent falsehood; (2) describing past or current facts; (3) that was relied upon by the other party.'" *Turbo Aleae Invs., Inc. v.*

*Borschow (In re Borschow)*, 2011 Bankr. LEXIS 1332, at *44 (Bankr. W.D. Tex. Apr. 8, 2011) (quoting *RecoverEdge, LP v. Pentecost*, 44 F.3d 1284, 1292 (5th Cir. 1995)). For a debt to be deemed non-dischargeable for actual fraud a creditor must show:

> (1) that the debtor made a representation; (2) that the debtor knew the representation was false; (3) that the representation was made with the intent to deceive the creditor; (4) that the creditor actually and justifiably relied on the representation; and (5) that the creditor sustained a loss as a proximate result of its reliance.

*Gen. Elec. Capital Corp. v. Acosta (In re Acosta)*, 406 F.3d 367, 372 (5th Cir. 2005).

In their pre-trial order and at the hearing, the Hartnetts asserted that they cannot be held individually liable for any debt owed to the O'Briens because they were merely acting as agents of Chad Powell Homes. While the Debtors may not have signed the Contract in their individual capacities, and may not be personally contractually liable under the promissory note, with respect to the allegedly tortious or fraudulent actions of the O'Briens,

> Texas courts have routinely found that 'a corporate officer may not escape liability where he had direct, personal participation in the wrongdoing, as to be the 'guiding spirit behind the wrongful conduct or the central figure in the challenged corporate activity.'" *Ennis v. Loiseau*, 164 S.W.3d 698, 707-708 (Tex. App.--Austin [3rd Dist.] 2005) (quoting Mozingo v. Correct Mfg. Corp., 752 F.2d 168, 174 (5th Cir. 1985)). In this case, [the debtor], as a corporate agent, may be held 'individually liable for fraudulent or tortious acts committed while in the service of [his] corporation.' *Shapolsky v. Brewton*, 56 S.W.3d 120, 133 (Tex. App.--Houston [14th Dist.] 2001, pet. denied), disapproved on other grounds, *Michiana Easy Livin' Country, Inc. v. Holten*, 168 S.W.3d 777, 789 (Tex. 2005).

*Morrison v. Western Builders of Amarillo, Inc. (In re Morrison)*, 555 F.3d 473, 481 (5th Cir. Tex. 2009) (addressing a plaintiff's section 523(a) non-dischargeability claims).

The February 11, 2010 letter was a renewal of credit in that ¶ 8.01 of the Contract called for the Contractor, at closing, to either pay the owners for the reverse change orders or give them a credit for that amount. The contactor did neither. Mr. Hartnett made the representation by signing the letter; he knew the representation was false; and he made it with the intent to deceive the O'Briens. The O'Briens actually and justifiably relied on the representation and they sustained a loss as a result of the reliance.

Thus the O'Briens are entitled to a $26,000 non-dischargeable judgment against Mr. Hartnett.

<u>11 U.S.C. § 523(a)(4)</u>: Section 523(a)(4) excepts from discharge any debt "for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny." 11 U.S.C. § 523(a)(4). "An analysis of nondischargeability under section 523(a)(4) is a two-step process – state law is consulted to determine whether the requisite trust exists; however, the fiduciary nature of the relationship ultimately remains a federal question." *In re Kilroy*, 354 B.R. 476, 493 (Bankr. S.D. Tex. 2006). Here, the O'Briens argued that Mr. Hartnett violated the Texas Construction Trust Fund statute, Tex. Prop. Code § 162.001 et seq., by misapplying construction trust funds, and using them not for the benefit of sub-contractors (as required) but for the benefit

of the Hartnetts, individually, and Chad Powell Homes.[2] In short, the O'Briens argued that Mr. Hartnett committed a defalcation while acting in a fiduciary capacity.

Section 162.003 of the Texas Property Code, which defines the beneficiaries under the Texas Construction Trust Fund Act, states,

> (a) An artisan, laborer, mechanic, contractor, subcontractor, or materialman who labors or who furnishes labor or material for the construction or repair of an improvement on specific real property in this state is a beneficiary of any trust funds paid or received in connection with the improvement.
>
> (b) A property owner is a beneficiary of trust funds described by Section 162.001 in connection with a residential construction contract, including funds deposited into a construction account described by Section 162.006.

Tex. Prop. Code § 162.003.

At the hearing, counsel for the Hartnetts correctly pointed out that section 162.003(b) (which provides that property owners are, in certain situations, beneficiaries under the statute) only became effective as of September 1, 2009. *See* am. Acts 2009, 81st Leg., ch. 1277 (H.B. 1513), § 3. The Hartnetts further argued that because all the transfers from the trust fund about which the O'Briens complained occurred prior to September 1, 2009, the Construction Trust Fund Act could not be applied to hold the Hartnetts liable to the O'Briens (as owners).

The court did not find any case-law specifically addressing whether this amendment to the Texas Construction Trust Fund Act has retrospective effect; the statute itself does not expressly state that it does. Under section 311.022 of the Texas Government Code, which governs construction of Texas statutes,[3] "[a] statute is presumed to be prospective in its operation unless expressly made retrospective." Tex. Gov't Code § 311.022 (2011).

Additionally, the Fifth Circuit endorses the general presumption that statutes which alter substantive rights or liabilities (as opposed to those that merely make procedural changes) should not be applied retrospectively. As explained by the Fifth Circuit:

> The Supreme Court recently clarified the circumstances in which a new statute which itself does not explicitly state whether it applies to pending cases should be applied retroactively. *See Landgraf v. USI Film Products, et al.*, 114 S. Ct. 1483, 128 L. Ed. 2d 229 (1994) (deciding whether certain provisions of the Civil Rights Act of 1991, Pub.L. No. 102-166, 105 Stat. 1071 (1991), should be applied

---

[2] The O'Briens also maintained that Mr. Hartnett violated a provision of the Contract whereby the Debtors were obligated to hold the funds advanced by the Plaintiffs for payment to subcontractors when the amount was earned. The O'Briens argued that the Hartnetts did not hold these funds as required, but rather used them for their own personal benefit and for the benefit of and Chap Powell Homes. The court did not find any provision of the Contract that created an express trust in favor of the O'Briens. At best, ¶ 4.5 arguably created a trust in favor of the sub-contractors, but no provision created such a trust in favor of the owners.

[3] *See* Tex. Gov't Code § 311.002 (2011) ("This chapter applies to: (1) each code enacted by the 60th or a subsequent legislature as part of the state's continuing statutory revision program; (2) each amendment, repeal, revision, and reenactment of a code or code provision by the 60th or a subsequent legislature; (3) each repeal of a statute by a code; and (4) each rule adopted under a code.").

> retroactively to pending cases). In so doing, the Supreme Court endorsed 'the traditional presumption against applying statutes affecting substantive rights, liabilities, or duties to conduct arising before their enactment.' *Id*. at 1504. That presumption is based on 'the unfairness of imposing new burdens on persons after the fact.' *Id*. at 1506. However, the Supreme Court stated that regardless of the general presumption against statutory retroactivity, 'in many situations, a court should "apply the law in effect at the time it renders its decision."' *Id*. (citing *Bradley*, 416 U.S. 696, 711, 94 S. Ct. 2006, 2016). Such situations generally involve procedural changes to existing law, including statutes which merely alter jurisdiction."

*Hartford Casualty Ins. Co. v. FDIC*, 21 F.3d 696, 700 (5th Cir. 1994); *see also Blaz v. Belfer*, 368 F.3d 501, 503 (5th Cir. 2004), *cert. denied*, 543 U.S. 874, 125 S. Ct. 97, 160 L. Ed. 2d 124, 2004 WL 2071175 (2004) (stating that there is a presumption against applying a statute retroactively, but the fulfillment of either of two conditions rebuts the presumption: "First, retroactive application is not impermissible where there is an express congressional intent favoring it. . . . Second, such application is permissible if it does not 'impair rights a party possessed when he acted, increase a party's liability for past conduct, or impose new duties with respect to transactions already completed.'").

In short, because the September 1, 2009 amendment to sub-section (b) of section 162.003 of the Texas Construction Trust Fund Act created liability to a new set of beneficiaries—a substantive rather than merely procedural change—the general presumption against applying the statute to conduct that occurred before the effective date applies. As that presumption has not be rebutted, the Texas Construction Trust Fund Act cannot be applied to hold the Hartnetts liable to the O'Briens in this case. As a result, the Hartnetts' debt to the O'Briens will not be found non-dischargeable under section 523(a)(4).

§523(a)(6): The O'Briens also plead § 523(a)(6), which excepts from discharge any debt incurred "for willful and malicious injury by the debtor to another entity or to the property of another entity." The court finds that there is no basis for recovery under this section.

Attorney's fees: The O'Briens asked for an award of attorney's fees pursuant to ¶ 6.16 of the Contract. Since the recovery described above is not based on the Contract, no award of attorney's fees is granted.

Judgment accordingly.

######